IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                              Criminal No.: ELH-17-191

GREGORY WHISONANT,
    Defendant.

**AMENDED MEMORANDUM OPINION[1]**

Defendant Gregory Whisonant, the leader of a drug trafficking organization, entered a plea of guilty on April 25, 2018, to the offenses of conspiracy to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846 (Count One), and possession of a firearm in furtherance of a drug trafficking crime, under 18 U.S.C. § 924(c) (Count Three). ECF 148. His two codefendants, who were lower-ranking members of the conspiracy, were involved in the murder of Donya Rigby, another member of the drug conspiracy.

Whisonant tendered his guilty plea pursuant to a Plea Agreement. *See* ECF 149. On July 19, 2018 (ECF 178), the Court sentenced Whisonant to a total term of 360 months of imprisonment, with credit for time served since March 21, 2017. ECF 180 (Judgment).

Whisonant, who is now self-represented, has filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF 309 (the "Motion"). The Motion is supported by two exhibits. ECF 309-1; ECF 309-2. The Office of the Federal Public Defender has declined to supplement the Motion or to represent Whisonant. ECF 316. The government opposes the

---

[1] The Memorandum Opinion is amended merely to clarify that the sentence reduction applies only to Count One. The overall sentence reduction remains unchanged.

Motion. ECF 318 (the "Opposition").  And, the government submitted several exhibits.  ECF 318-1 to ECF 318-5; ECF 320. Defendant has replied. ECF 329 (the "Reply").

Whisonant has also filed a motion to compel his defense attorney, Ryan Burke, to release the "work product file that was created during the time he represented" Whisonant. ECF 301 ("Motion to Compel"). Burke opposes the motion. ECF 306.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion, in part. In particular, I shall reduce defendant's total sentence from 360 months to 295 months of incarceration, *i.e.*, 235 months for Count One and 60 months, consecutive, for Count Three.  And, I shall direct the government to respond to the Motion to Compel.

## I.    Background[2]

Whisonant was the leader of a drug trafficking organization ("DTO") in Baltimore, which conspired to distribute more than one kilogram of heroin. See ECF 149, ¶ 6(a); Presentence Report ("PSR"), ECF 166, ¶ 6. The Drug Enforcement Administration conducted a wiretap investigation of the drug shop, which led to Whisonant's arrest in May 2017. Law enforcement recovered 350 grams of heroin at defendant's residence, along with a loaded firearm, packaging material, and more than $10,000 in cash. *Id*.

On July 11, 2017, a federal grand jury returned a Superseding Indictment (ECF 63), charging Whisonant and three others with various crimes. In particular, Whisonant was charged as follows: conspiracy to distribute one kilogram or more of heroin from January 2017 through

---

[2] Throughout the opinion, I cite to the electronic pagination.  But, the electronic pagination does not always correspond to the page numbers that appear on the parties' submissions.

To the extent relevant, I incorporate here the facts recounted in my prior Memorandum Opinion (ECF 251) regarding Whisonant's § 2255 motion (ECF 216).

March 21, 2017, in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) (Count Two); possession of a firearm (i.e., a loaded Glock 17, 9mm handgun) in furtherance of a drug trafficking crime, to wit, the offense charged in Count Two, in violation of 18 U.S.C. § 924(c) (Count Three); and possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) (Count Four).

Harry McKnett, a seasoned criminal defense attorney, was appointed to represent Whisonant. *See* ECF 42.  However, on March 13, 2018, after an attorney inquiry hearing, Ryan Burke, another veteran defense attorney, was appointed to represent him. ECF 137; ECF 140.

Based on Whisonant's criminal history, he was eligible for a sentencing enhancement under 21 U.S.C. § 851, which, at the time, would have increased his mandatory minimum sentence under Count One from ten years to life imprisonment ("851 Enhancement"). *See* ECF 149, ¶ 10. In particular, at the time, 21 U.S.C. § 841(b)(1)(A) (2017) provided: "If any person commits a violation . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release . . . ."

As noted, Whisonant pleaded guilty to Counts One and Three of the Superseding Indictment. ECF 148. Count One carried a ten-year mandatory minimum term of imprisonment, and Count Three carried a mandatory minimum sentence of five years, consecutive to any other term of imprisonment. ECF 194, ¶ 3.  Of import, in the Plea Agreement, the government agreed not to seek the § 851 Enhancement. ECF 149, ¶ 10; *see* ECF 201 (Rearraignment Tr.) at 17-18 (explaining the government's agreement not to seek the § 851 Enhancement).. It also agreed to dismiss the remaining counts. ECF 149, ¶ 15.[3]

---

[3] Five months after Whisonant's sentencing, on December 21, 2018, the President signed the First Step Act.  Among other things, it reduced the sentencing exposure for § 851 enhancements by imposing a mandatory minimum term of 25 years' imprisonment, rather than a mandatory life

In the Plea Agreement, the parties stipulated to the following facts, ECF 149, ¶ 6(a):

Beginning at a time unknown, but continuing through March of 2017, the Defendant, Gregory Whisonant, conspired with others to distribute heroin in the southwest section of Baltimore, Maryland. During the period of the conspiracy, the Drug Enforcement Administration (DEA) obtained authority to intercept the communications of the defendant and other members of the drug trafficking organization (DTO) operating in the area of the Shipley Park neighborhood of Baltimore, Maryland. The intercepted communications confirmed that the defendant was the leader of the DTO that included several other members. Specifically, the organization sold heroin packaged in greentopped vials in the Shipley Park neighborhood in Southwest Baltimore. Various interceptions revealed that the defendant maintained supervisory control over his coconspirators. Investigators identified 7722 Timbercross Lane as the Defendant's primary residence and executed a search and seizure warrant at that address on March 21, 2017. Agents arrested Whisonant and recovered at that location approximately 350 grams of heroin, a stolen and loaded Glock 9mm handgun with an extended magazine, packaging material, and over $10,000 in currency.

The Defendant admits that he conspired with others to distribute and possess with the intent to distribute heroin, and that it was reasonably foreseeable to him that members of the conspiracy distributed more than one kilogram of heroin. The defendant further agrees that he knowingly possessed the Glock firearm as protection for him, his drug proceeds, and in furtherance of his drug trafficking crimes.

In the Plea Agreement, Whisonant agreed that he was subject to a 4-level enhancement under § 3B1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), because he led a drug trafficking organization that involved five or more participants.  ECF 149, ¶ 6(b)(i).  And, defendant agreed that, at sentencing, the government could introduce evidence of Whisonant's "potential knowledge" of the murder of Rigby, committed by other members of the DTO, in furtherance of the drug conspiracy.  *Id.* ¶ 8.

---

sentence.  *See* 18 U.S.C. § 841(b)(1)(A) (2019) ("If any person commits a violation . . . after 2 or more prior convictions for a serious drug felony or serious violent felony have become final, such person shall be sentenced to a term of imprisonment of not less than 25 years . . . .").  Life imprisonment, while no longer mandatory, remains the statutory maximum sentence.  *See id.*

As to Count One, the parties agreed that defendant had an offense level of at least 34. ECF *Id.* ¶ 6(b)(i). But, the government also believed that defendant qualified as a Career Offender under U.S.S.G. § 4B1.1. *Id.* If so, prior to deductions under U.S.S.G. § 3E1.1, defendant's offense level would increase to 37, under U.S.S.G. § 4B1.1(b)(1). *See* ECF 149, ¶ 6(b)(i). Further, if Whisonant were a Career Offender, his Guidelines for the § 924(c) offense would be governed by U.S.S.G. § 2K2.4(c) and § 4B1.1. ECF 149, ¶ 6(b)(ii). And, if so, his advisory sentencing Guidelines range would be 360 months to life imprisonment, pursuant to U.S.S.G. § 4B1.1(c)(3). ECF 149, ¶ 6(b)(ii). The government agreed to recommend a "reasonable" sentence after consideration of the final advisory Guidelines range. *Id.* ¶ 15.

The Presentence Report, ECF 166, determined that Whisonant qualified as a Career Offender. This enhanced his base offense level to 37 for Count One. *Id.* ¶ 20. The underlying offense of conviction (conspiracy) was deemed a qualifying offense, and the predicates were the felony drug offenses in ¶¶ 29, 33, and 40 of the PSR. *See* ECF 166. The offenses in ¶¶ 29 and 40 reflected convictions for possession with intent to distribute CDS. And, ¶ 33 reflected convictions for unlawful manufacture of CDS as well as drug conspiracy. In effect, because defendant qualified as a Career Offender, it rendered moot the four-level enhancement under § 3B1.1(a). After deductions for acceptance of responsibility under § 3E1.1(a), (b). Whisonant's final offense level for Count One was 34. *Id.* ¶ 23.

As a Career Offender, Whisonant had a criminal history category of VI. *Id.* ¶ 49. The PSR noted, however, that defendant had 17 criminal history points. *Id.* ¶ 48.[4] Therefore, even if Whisonant were not a Career Offender, his criminal history category was still a VI.

---

[4] In addition, defendant had other convictions that did not score points.

Whisonant's prior convictions included multiple drug offenses. Moreover, Whisonant committed the underlying federal offenses while on probation in Maryland for a 2013 conviction for possession with intent to distribute CDS. *Id.* ¶¶ 29, 47.

As mentioned, in the Plea Agreement, if defendant qualified as a Career Offender, the parties agreed that the Guidelines would call for a sentence of 360 months to life imprisonment under U.S.S.G. § 4B1.1(c)(3). ECF 149, ¶ 6(b)(ii). However, according to the PSR, Whisonant's Guidelines called for a period of incarceration ranging from 322 to 387 months. ECF 166, ¶ 114. In its sentencing memorandum, the government acknowledged the accuracy of the Guidelines as set forth in the PSR. *See* ECF 175 at 4.

At sentencing on July 19, 2018 (ECF 178), Whisonant was thirty-nine years old. *See* ECF 166 at 3.  Defendant reported heavy marijuana usage from age fourteen until 2015. ECF 166, ¶ 90. He also indicated that he abused Percocet from 2005 to 2011. *Id.* ¶ 91. Whisonant expressed an interest in substance abuse treatment in the Bureau of Prisons. *Id.* ¶ 92.

The Court determined that Whisonant qualified as a Career Offender. ECF 202 at 10. The Court also reviewed the discrepancy in the Guidelines range, as between the Plea Agreement if defendant were a Career Offender (360 months to life) and the PSR (322 to 387 months). The Court agreed with the calculations in the PSR. *See* ECF 202 at 7- 11.

As contemplated by the Plea Agreement, the government presented evidence of intercepted, recorded telephone calls during the investigation of the DTO.  This included a call that captured in real time the murder of Rigby, a young, street-level drug dealer for the DTO. *See* ECF 202 (Sentencing Tr.) at 15-21.

According to the government, the defendant knew of the plan by others in the DTO to kill Rigby, and he went to the scene to witness the murder. However, the defendant disputed any

involvement in Rigby's murder. ECF 202 at 21-23. Defense counsel said, *id*. at 23: "Quite frankly, my client couldn't even pick Mr. Rigby out of a photo array . . . ."

The government recommended a total sentence of 360 months of incarceration. Whisonant advocated for a 180-month sentence, which corresponded to the mandatory minimum sentence. ECF 174; ECF 175.

Before imposing sentence, the Court expressly considered the objectives of sentencing, the facts of the case, the defendant's prior record, and the personal circumstances of the defendant. *See* ECF 202 at 34-43. For example, the Court took note of defendant's "very difficult childhood that was plagued by economic disadvantage, drug-addicted parents, [and] an abusive father." ECF 202 at 36. Further, the Court noted the defendant's early drug use. *Id*. As for the murder of Rigby, the Court concluded that the defendant "knew in advance" and "didn't stop it." *Id*. at 42-43. But, the Court also said "that would be the limit of what [the evidence] shows." *Id*.

The Court sentenced the defendant to a total term of 360 months' imprisonment: 300 months' imprisonment for Count One and 60 months' imprisonment, consecutive, for Count Three. *Id*. at 11, 43; ECF 180. That sentence essentially fell in the middle of what was then the advisory sentencing Guidelines range.

Whisonant filed a notice of appeal the next day. *See* ECF 182. However, he subsequently dismissed his appeal. ECF 208.

Approximately six months later, on July 8, 2019, Whisonant filed a post-conviction motion under 28 U.S.C. § 2255. ECF 216. In his § 2255 motion, defendant alleged ineffective assistance of counsel. ECF 216. By Memorandum Opinion (ECF 251) and Order (ECF 252) of March 3, 2020, I denied Whisonant's § 2255 motion, and I declined to issue a Certificate of Appealability.

Whisonant appealed.  ECF 262.  The Fourth Circuit denied a Certificate of Appealability and dismissed his appeal. ECF 270.

Whisonant is currently serving his sentence at Hazelton FCI. He has a projected release date of January 2, 2043.   *See Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed May 30, 2023). To date, Whisonant has served approximately 20% of his sentence.

Defendant filed a petition with the Warden on January 6, 2022, seeking compassionate release on the basis of his medical issues and family circumstances. ECF 309 at 3; *see also* ECF 318-1. His petition was denied on February 11, 2022. ECF 309-2; ECF 318-2.

This Motion followed on March 19, 2022. ECF 309. Whisonant argues for release on the basis of the COVID-19 pandemic, unspecified medical issues, his status as the only caregiver for his minor child, and a change in sentencing law due to passage of the First Step Act of 2018 ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)). *Id.* at 5.  He complains, *id.*:  "I have medical needs that the institution is not trying to help with."  *Id.*  Further, he points out that he has a strong support system and "employment already set up," and that he has engaged in rehabilitation efforts while incarcerated. *Id.* As an alternative to early release, Whisonant seeks home confinement or a stay of his Motion, pending the "publishing of the Equals Act." ECF 329 at 3.

The government argues that Whisonant has failed to exhaust his administrative remedies as to his COVID-19 and disparate sentencing claim, because Whisonant's request for an administrative remedy does not include a request for relief on these bases. ECF 318 at 10.  Further, the government contends that Whisonant has not shown that he is the only available caretaker for his minor daughter, Z.B.  *Id.* at 11-12. And, the government argues that Whisonant should not be

granted compassionate release because he has refused to be vaccinated for COVID-19. *Id.* at 13. Further, the government avers that the FSA does not change Whisonant's sentence. *Id.* at 14. The government also cautions against early release of defendant due to his significant criminal history and the seriousness of the underlying offense. *Id.* at 15-16.

Additional facts are discussed, *infra*.

### III. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Congress "broadened" the authority of the courts in 2018, with passage of the FSA. *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality in regard to a federal sentence. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub.

L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release

had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see*, *e.g.*, *Orlansky v. FCI*

*Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230,

2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because

§ 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on

an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on*

*Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66

(2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on

average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, a federal inmate is now

permitted to file a motion for compassionate release directly with the court after exhaustion of

administrative remedies.  *See United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).

Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment

"upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has*

*fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the

defendant's facility," whichever occurs first.  (Emphasis added).  *Id.*

Once a defendant has exhausted his administrative remedies, or after 30 days have passed

from the date on which the warden has received the defendant's request, the defendant may petition

a court directly for compassionate release.  *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169;

*United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  This

constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Bethea*, 54 F.4th at 831. In other words, the analysis consists of "two steps." *Bond*, 56 F.4th at 383. And, for a court to award compassionate release, it must conclude that the movant satisfies both criteria. *Bethea*, 54 F. 4th at 831; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021). If that criteria is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[5] In

---

[5] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A). *See*, *e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276. Of significance here, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the FSA. It is *only* "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Brooker,* 976 F.3d 228, 235-36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and

compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.   And, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."   *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam).   Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release., U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.   Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.   But, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.   *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); *see United States v. Gutierrez*, ___ Fed. App'x ___, 2023 WL 245001, at *4 (4th Cir. Jan. 18, 2023) (stating that, in considering a compassionate release motion, the district court erred by failing to address the defendant's evidence of rehabilitation).   Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t). Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the

evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court said, in the context of § 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act [of 2010] . . . ." *Id.* at 2402 n.6. The Court explained that the "Guidelines range 'anchor[s]' the sentencing proceeding . . . . The district court may then consider postsentencing conduct or nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark." *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, 64 F.4th 177, 183-84 (4th Cir. 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2. However, such changes do not warrant a recalculation of the Guidelines. *Troy,* 64 F.4th at 184.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). And,

14

compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at \*2-3 (W.D. N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, that does not end the inquiry.  The second step requires the court to consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. Mangarella*, 57 F.4th 197, 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at \*1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at \*2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"  *Bond*, 56 F.4th at 384 (quoting *United States v. Jackson*, 952

F.3d 492, 500 (4th Cir. 2020)).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384-85.

Of relevance, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release."  *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167.  And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions, and had "'a reasoned basis'" for the exercise of his or her discretion.  *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

Moreover, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments."  *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n. 3.  That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case."  *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion."  *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.  Moreover, "the district court is less likely to have abused its discretion if it considered

arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*). In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

## IV. COVID-19[6]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[7] Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* Trump White House (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-

---

[6] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[7] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.   That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus could cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of March 10, 2023, COVID-19 has infected more than 103.8 million Americans.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Apr. 20, 2023).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v.*

*Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2023, the CDC updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (February 10, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease;

smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://www.cdc.gov/aging/covid19/index.html.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive."  *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category."  *Id.* at 196.  Nevertheless, the court may consider the CDC's guidelines.  *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam).  And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19."  *Bethea*, 54 F.4th at 832.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://bit.ly/3dPA8Ba (last accessed Apr. 20, 2023).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg.*

*Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing).  They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.

Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[8]

---

[8] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

**C.**

23

Unfortunately, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

On March 29, 2022, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.  Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the initial vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021),

https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. Much has changed since that time.

As of April 19, 2023, the BOP had 145,196 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 349,798 vaccine doses to staff and inmates. *See* Bureau of Prisons, https://www.bop.gov/coronavirus/ (last updated Apr. 19, 2023).[9]

Also as of May 11, 2023, approximately 69% of the total U.S. population has completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, Ctrs. for Disease Control, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop5 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, Ctrs. for Disease Control, https://covid.cdc.gov/covid-data-tracker/#vaccination-demographics-trends (final update May 11,

---

[9] This webpage no longer appears to be in service. However, the BOP continues to update individual facility statistics at https://www.bop.gov/coronavirus/covid19_statistics.html.

2023).  Moreover, approximately 54.5 million Americans have received a "booster" vaccine dose, which the CDC recommends for all persons age 5 and older.  *See id*.; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated May 23, 2023).

### D.

The number of COVID-19 cases continues to fluctuate.  For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021),

https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html. But, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records*., WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

The country then experienced another surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ." *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases. As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants." Ed Yong, *Is BA.5 the 'Reinfection*

*Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.   But, the variant then seemed to subside.   *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Apr. 15, 2023).

At this point, COVID-19 has, in a sense, become a fact of life.   *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021,   https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").   In other words, we are in "a more endemic phase of this crisis . . . ."   *See* District of Maryland Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022).   Indeed, in an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.   Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).   He stated: "The pandemic is over.   We still have a problem with COVID.   We're still doing a lotta work on it . . . .   But the pandemic is over."   *Id.*

On February 10, 2023, President Biden provided notice of his intent to terminate the COVID-19 national emergency, which went into effect on May 11, 2023.   *Termination of COVID-19 National Emergency*, ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (Apr. 3, 2023).   And, Congress passed a joint resolution (H.J. Res. 7) to end the national emergency.   *Id.*

In any event, it appears that "virus metrics have stabilized."   Standing Order 2022-05. Indeed, as of March 10, 2023, Johns Hopkins University stopped collecting data as to the virus. *See* COVID-19 Dashboard, *supra*, https://bit.ly/2WD4XU9. And, as Chief Judge Bredar of this Court has noted, in consultation with this court's epidemiologist, the virus patterns have changed,

with the virus's severity decreasing as "the population has gained some level of immunity from vaccinations and prior infections." *Id.* Put another way, the coronavirus may be here to stay, but the acute nature of the crisis has certainly abated.

With respect to the BOP, it has reported that, as of May 1, 2023, 188 federal inmates, out of a total inmate population of 145,473, and 28 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19. Moreover, 44,057 inmates and 15,272 staff have recovered from the COVID-19 virus. In addition, 317 inmates and seven staff members have died from the virus. The BOP has completed 128,639 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

As to FCI Hazelton, where the defendant is now imprisoned, the BOP reported that as of May 17, 2023, out of a total of 2,103 inmates, zero inmates and zero staff members currently test positive, three inmates and zero staff members have died of COVID-19, and 136 inmates and 125 staff have recovered at the facility. In addition, at the Hazelton Complex, 487 staff members and 3,429 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/covid19_statistics.html; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/haf/ (last accessed May 17, 2023).[10]

### IV. Discussion

### A.

Whisonant argues that extraordinary and compelling circumstances warrant his compassionate release. He relies generally on COVID-19, as well as his medical issues, family circumstances, and a change in sentencing law. ECF 309. However, as noted, Whisonant does not

---

[10] The BOP does not have vaccination data for just FCI Hazelton, rather, it has data for the Hazelton Complex which also includes USP Hazelton.

specify the medical conditions that he believes warrant his compassionate release. And, as indicated, he points to changes in sentencing under the FSA.

As a preliminary matter, the government contends that Whisonant cannot raise his COVID-19 and FSA sentencing claim in the Motion, because he failed to exhaust his administrative remedies as to these issues. ECF 318 at 10. In particular, the government complains that defendant did not raise with the Warden the claim of changes in sentencing law under the FSA. *See* ECF 318-1. However, defendant clearly sought relief on the basis of a "medical issue." ECF 318-1 at 2. And, to my knowledge, the FSA would not have been a basis on which the Warden could have granted compassionate relief.  Therefore, I reject the government's exhaustion argument.

Nevertheless, Whisonant's "compassionate release motion cannot be used to challenge the validity of [his] sentence." *Ferguson*, 55 F.4th at 272.  Moreover, the effect of the First Step Act on a § 851 enhancement is of no moment in this case because, under defendant's Plea Agreement, defendant was not subject to a § 851 enhancement.

Whisonant's medical records indicate that he suffers from three conditions that the CDC identifies as risk factors for a more serious case of COVID-19. ECF 320 at 115. In particular, a person is considered overweight if his BMI is 25 or higher and obese if his BMI is 30 or higher. On March 15, 2022, Whisonant weighed 211.6 pounds. ECF 320 at 169. Given that his height is listed as 5'11" in the PSR, ECF 166, ¶ 84,  his BMI at the time of his medical examination was 29.5.  *Adult     BMI     Calculator*, Center     for     Disease     Control, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited January 25, 2023).  This qualifies him as overweight, and verging on obese (i.e., BMI over 30 under the CDC guidelines).  He also has hypertension and chronic heart disease. ECF 320 at 198.

In light of the pandemic, some courts have found that obesity, and even borderline obesity, can serve as a basis for compassionate release.  *See, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Dawson*, ADM-18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on the defendant's obesity).

Some courts have found extraordinary and compelling circumstances based on hypertension. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).  Although not a COVID-19 risk factor, Whisonant has also described medical issues relating to severe hemorrhoids and constipation. ECF 331.[11]

Moreover, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.  Numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions, such as those applicable to Whisonant. *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021)

---

[11] The defendant's medical records show that on June 22, 2022, he submitted a request for surgery to treat his hemorrhoids. ECF 320 at 230. In reply, the BOP's medical staff indicated that Whisonant was scheduled to have a colonoscopy, and necessary changes to his plan of care would be made after his provider reviewed the results. *Id.* at 231. From Whisonant's records, it is unclear whether he had the colonoscopy.

(defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *United States v. Hilow*, JD-15-170, 2020 WL 2851086, at *4 (D.N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, CR-08-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason).

But, Whisonant's medical records show that he has refused medical treatment on several occasions, such as forgoing a comprehensive metabolic panel and an influenza vaccine. *See* ECF 320 at 52, 60, 66, 69. Moreover, Whisonant also declined the COVID-19 vaccine on March 12, 2021. *Id.* at 123. Whisonant's decision to refuse the COVID-19 vaccine weighs against him. Indeed, his refusal substantially weakens his argument for compassionate release.

The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating,

including the Delta variant," and that "[w]idespread vaccination is a critical tool to help stop the pandemic." *Key Things to Know about COVID-19 Vaccines*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated July 20, 2022). And, I have joined a growing number of district court judges across the country, including in the District of Maryland, in reasoning that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release.

In *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021), the Seventh Circuit said: "[A] prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an 'extraordinary and compelling' justification for release. The risk is self-incurred." Similarly, Judge Gallagher of this Court has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release . . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases). And, in *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021), the Court observed: "[W]ith access to the vaccine, an inmate largely faces the same risk from COVID-19 as those who are not incarcerated." *See United States v. Ealy,* JPJ-00-104, 2023 WL 2176574, at *3 (W.D. Va. Feb. 23, 2023); *United States v. Jones,* JCD-17-22, 2022 WL 17472232, at *3 (E.D. N.C. Dec. 6, 2022); *United States v. Poulson*, RCY-18-49, 2022 WL 3970198, at *3 (E.D. Va. Aug. 31, 2022); *United States v. Dempsey*, TNM-19-368, 2021 WL 2073350, at *3–4 (D.D.C.

May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, JAW-16-00103, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, JFL-18-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, JDB-19-292-5, 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).  But *see United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release).

Notably, "vaccines are the best way to protect [an individual] and others against COVID-19."  Dr. Francis Collins, *Latest on Omicron Variant and COVID-19 Vaccine Protection*, NIH Director's Blog (Dec. 14, 2021), https://directorsblog.nih.gov/2021/12/14/the-latest-on-the-omicron-variant-and-vaccine-protection/.  Moreover, the vaccine is central to preventing dangerous mutations.  *See, e.g.*, *Another Reason To Get Vaccinated? To Stop Variants From Developing*, Henry Ford Health Sys. (Sept. 27, 2021), https://www.henryford.com/blog/2021/09/get-vaccinated-to-stop-variants.  To be sure, "[a] prisoner has the right to refuse vaccination . . . ."  *United States v. Allen*, KM-18-216, 2023 WL 314351, at *7 (D.N.J. Jan. 19, 2023).  But, "courts have rightly cast a skeptical eye on prisoners who refuse vaccination while simultaneously claiming that only release from prison will relieve the danger of COVID-19."  *Id.*   Indeed, "[a]t the end of the day, district judges are not

epidemiologists." *United States v. Sherrod*, AJT-19-20139, 2021 WL 3473236, at \*5 (E.D. Mich. Aug. 6, 2021).

Whisonant filed his Motion in May 2022.   Based on the government's opposition, defendant is aware of the government's contention that his refusal to get vaccinated militates against his claim for compassionate release due to his medical conditions.   In all this time, defendant has not advised the Court that he has since been vaccinated.   In my view, given defendant's failure to get vaccinated, I cannot conclude that defendant's medical conditions constitute a basis for compassionate release.

Whisonant also argues that his family circumstances support a finding of compelling and extraordinary reasons to reduce his sentence. ECF 309 at 4-5. Specifically, Whisonant claims that he has been his daughter's "only parent since she was 4 years old." *Id.* at 5.

Relevant here, the commentary to U.S.S.G. § 1B1.13 provides that either "(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children" or "(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner" may constitute a compelling reason for the defendant's release.  U.S.S.G. § 1B1.13 cmt.1(C).

Whisonant did not proffer medical or death records to substantiate this claim. And, as recently as 2017, Whisonant's only minor child was living with her mother in Baltimore. *See* ECF 166, ¶ 82.[12] In the absence of evidence that a prisoner is the sole available caregiver for his minor

---

[12] Whisonant does not specify which of his daughters' mothers passed away. ECF 309 at 5; *see also* ECF 318 at 11 n. 5. In 2017, Whisonant had two minor daughters, And, the mother of one of Whisonant's daughters did indeed pass away. *Id.* However, that child is no longer a minor. *See* ECF 318 at 11-12.  As of May 2023, only one of defendant's daughters is under 18 years of age. *See* ECF 166, ¶ 82.

child or incapacitated spouse, district courts typically find that the inmate's family circumstances do not amount to an extraordinary and compelling reason within the meaning of 18 U.S.C. § 3582(c)(1)(A).  *See*, *e.g.*, *United States v. Johnson*, 13-00082 (KSH), 2021 WL 3260847, at *4 (D.N.J. Jul. 29, 2021); *United States v. Tucker*, 3:14-CR-0367-B-84, 2021 WL 977100, at *1 (N.D. Tex. Mar. 15, 2021); *United States v. Tyler*, Crim. No. 09-391, 2021 WL 736467, at *4 (E.D. La. Feb. 25, 2021); *United States v. Bolden*, CR-16-320-RSM, 2020 WL 4286820, at *5 (W.D. Wash. Jul. 27, 2020).

## B.

A defendant's lengthy sentence may qualify as an extraordinary and compelling reason for compassionate release.  *See McCoy*, 981 F.3d at 286 ("[T]he district courts permissibly treated as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' [] sentences[.]"); *see also United States v. Kratsas*, DKC-92-0208, 2021 WL 242501, at *4 (D. Md. Jan. 25, 2021).  Therefore, I shall next consider whether the severity of defendant's sentence warrants compassionate release.

The United States Sentencing Commission is an agency that "Congress has tasked with promulgating 'guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case.'" *United States v. Furlow*, 928 F.3d 311, 314 n.1 (4th Cir. 2019) (quoting 28 U.S.C. § 994(a)(1)). Of relevance here, "the career offender provision is an advisory guideline promulgated by the United States Sentencing Commission.[]" *Id.* at 314.

Unlike the mandatory sentencing provisions applicable to an Armed Career Criminal, 18 U.S.C. 924(e), "the career offender provision creates no statutory penalty." *Furlow*, 928 F.3d at 314; *see* U.S.S.G. § 4B1.1. However, a defendant who qualifies as a career offender "may be subject to an increased guidelines offense level and criminal history category, which would result in an increased Guidelines range." *Furlow*, 928 F.3d at 314 (citing U.S.S.G. § 4B1.1(b)).

To be sure, the sentencing Guidelines are merely advisory, not mandatory. *See*, *e.g.*, *Rita v. United States*, 551 U.S. 338, 361-62 (2007); *United States v. Booker*, 543 U.S. 220, 260-62 (2005). But, it is equally clear that the sentencing Guidelines are the "foundation of federal sentencing decisions." *United States v. Hughes*, ___ U.S. ___, 138 S. Ct. 1765, 1775 (2018). Indeed, the sentencing Guidelines have been described as the "starting point" in the effort of a judge to fashion a reasonable sentence. *Freeman v. United States*, 564 U.S. 522, 529 (2011). Thus, the Supreme Court has described the sentencing Guidelines as "the lodestone of sentencing." *Peugh v. United States*, 569 U.S. 530, 544 (2013); *see Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016). Because of the "central role in sentencing" that attaches to the advisory sentencing Guidelines, an "error related to the guidelines can be particularly serious." *Molina-Martinez*, 578 U.S. at 199; *see United States v. Winbush*, 922 F.3d 227, 231 (4th Cir. 2019); *United States v. Feldman*, 793 F'Appx. 170, 174 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 469 (4th Cir. 2017).

At his sentencing, defendant was found to be a Career Offender. ECF 166, ¶¶ 20, 49. This increased his base offense level from 34 to 37. *Id.* ¶¶ 19, 20. However, the legal landscape has changed since defendant's sentencing in July 2018. ECF 178. About one year after defendant's sentencing, in August 2019, the Fourth Circuit decided *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019). In *Norman*, the Court concluded that a federal drug conspiracy offense is not a qualifying Career Offender offense under U.S.S.G. § 4B1.2(b). *Id.* at 237-39. This means that defendant would not qualify as a Career Offender if he were sentenced today, because his underlying offenses – drug conspiracy (Count One) and possession of a firearm in furtherance of drug trafficking (Count Three) – would not qualify him for Career Offender status. Nevertheless, this determination would not have changed defendant's mandatory minimum sentences of ten years for Count One and five years, consecutive, for Count Three.

The parties do not address *Norman*.  Moreover, *Norman* is not retroactive. *See United States v. Nicholson,* 858 F'Appx. 639, 640 (4th Cir. 2021).  And, as *Troy* makes clear, 64 F.4th at 183-184, this change in status does not alter the defendant's Guidelines calculation.  But, the Court certainly may, in its discretion, consider changes in the legal landscape when deciding whether to reduce a defendant's sentence.  *Concepcion*, 142 S. Ct. at 2396.

With respect to Count One, if defendant were not a Career Offender, after three deductions under U.S.S.G. § 3E1.1, his final offense level would have been 31.  With a Criminal History Category of VI, defendant's Guidelines range for Count One would have been 188 to 235 months.  And, the Guidelines for Count Three is 60 months, consecutive.  Thus, defendant's total Guidelines range would have been 248 to 295 months of imprisonment, rather than the range of 322 to 387 months, as the Court and the PSR determined. ECF 166, ¶ 114; ECF 181 (Statement of Reasons).

Of relevance, Whisonant's total sentence of 360 months is arguably in excess of more recent sentences in this District for equally serious offenses.  As Judge Chuang commented when reducing the life sentence for a defendant convicted of being the leader of a drug conspiracy involving more than 50 kilograms of powder cocaine and 1.5 kilograms of cocaine base, "sentences presently imposed in this District for drug trafficking offenses . . . rarely reach 292 months, much less 360 months." *United States v. Nicholson*, No. TDC-03-0268, ECF No. 394 at 10 (D. Md. May 21, 2021).

Further, the Court is mindful that Whisonant was not the one who actually shot Rigby.  And, Whisonant's total sentence of 360 months appears longer than at least some federal sentences recently imposed for drug offenses involving murder. *See, e.g., United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for

murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)); United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2018, Fourth Circuit, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/4c18.pdf, *aff'd, McCoy*, 981 F.3d 271.

In my view, Whisonant's lengthy and severe sentence qualifies as an extraordinary and compelling reason that renders him eligible for consideration for  compassionate release. *See McCoy*, 981 F.3d at 286.  But, this does not end the inquiry.

## C.

Even when a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

Rehabilitation efforts should be considered in regard to the Motion.  *See Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *McDonald*, 986 F.3d at 410-12 (noting that on a motion to reduce sentence under the First Step Act, the district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021)

("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

Courts place significant weight on a defendant's post-sentencing conduct, because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)).  The court must "at least weigh the [defendant's] conduct in the years since the initial sentencing." *McDonald*, 986 F.3d at 412; *see United States v. Martin,* 916 F.3d 389, 397 (4th Cir. 2019) (requiring an "individualized explanation" as to rehabilitative efforts).  A defendant's behavior while in BOP custody is an important indicator of whether he remains a danger to the community.  *See* 18 U.S.C. § 3582(c)(1)(A)(ii).

Whisonant has engaged in rehabilitative efforts.  Significantly, his efforts include completing his GED while in BOP custody. ECF 331-1. But, "rehabilitation alone cannot serve as a basis for compassionate release." *Davis*, 2022 WL 127900, at *1.  Moreover, it is troubling that Whisonant has had several disciplinary incidents since being incarcerated.  These include a sanctioned incident involving a fight with another person. ECF 318-5.

In my view, a balancing of the § 3553(a) factors indicates that defendant's release from prison is not warranted at this time. As the government asserts, Whisonant's crimes of conviction were extremely serious.  Whisonant had a leadership role in a major heroin trafficking organization, and he used a firearm in furtherance of his crimes. ECF 166, ¶¶ 8-9. Such conduct was in complete disregard to the safety of others. Moreover, when Whisonant was arrested, agents recovered $10,000 in cash. *Id.*

¶ 9. And, as discussed, the Court determined that Whisonant knew that his codefendants planned to murder Rigby, but he did nothing to stop the heinous crime. ECF 202 at 36.

Additionally, the Court cannot overlook the defendant's extensive criminal history. It reveals a pattern of recidivism and yielded a criminal history category of VI, with or without Career Offender status. ECF 166, ¶ 48. In particular, Whisonant had 18 prior adult criminal convictions. ECF 166, ¶¶ 28-45. He was convicted of drug charges ten times prior to the commission of the instant offense. *See* ECF 166, ¶¶ 29, 31, 33–38, 40–41. Further, defendant has experienced significant periods of incarceration as a result of these convictions. *Id.* ¶¶ 29, 31, 33, 40 Yet, that did not deter him from engaging in crime. And, he has twice been convicted of violating his probation. *Id.* ¶¶ 29, 31. Moreover, he was on probation when the underlying offenses occurred. *See* ECF 166, ¶¶ 40, 47.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020). Accordingly, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in this Circuit and elsewhere have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13,

2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

As I see it, the period of incarceration that Whisonant has served to date is not sufficient to warrant his immediate release.  His lengthy and disturbing prior record, including repeated violations of probation, are of concern to the Court, particularly when coupled with his disciplinary infractions.  And, this was a very serious case, for which severe punishment is justified.

However, as noted, defendant was erroneously designated as a Career Offender, which impacted his advisory Guidelines.  And, given the contours of this case, I am of the view that a sentence within the revised Guidelines is appropriate in light of the factors in 18 U.S.C. § 3553(a). Therefore, I shall reduce Whisonant's total sentence to 295 months, as this is a sentence that is "sufficient, but not greater than necessary" and complies with the sentencing objectives of of 18 U.S.C. § 3553(a).

Whisonant also appears to request, as an alternative to early release, that he be placed in home confinement. ECF 331 at 3. But, any request for the conversion of a sentence of imprisonment to a sentence of home confinement must be submitted to the BOP, and not to this Court. Section 3624(c) of Title 18 of the United States Code is the only statute that authorizes the transfer of an inmate from prison to home confinement. That section specifically provides that "[t]he authority under this subsection may be used to place a prisoner in home confinement for the shorter of ten percent of the term of imprisonment of that prisoner or six months." 18 U.S.C. § 3624(c)(2). However, this authority resides with the BOP, and not with the courts.

Moreover, although § 12003(b)(2) of the CARES Act states that, during the COVID-19 emergency, "the director of the Bureau [of Prisons] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement," this provision does not alter the exclusive authority of the BOP to make this determination. *See United States v. Baker*, MR-10-69, 2020 WL 2430945, at *1 (W.D. N.C. May 12, 2020) (stating that authority to grant such relief rests solely with the Director of the Bureau of Prisons); *United States v. Gray*, FL-12-54, 2020 WL 1943476, at *3 (E.D. N.C. Apr. 22, 2020) (finding "defendant must seek home confinement through the BOP's administrative system"); *United States v. Johnson*, JKB-14-0356, 2020 WL 1929459, at *2 (Apr. 21, 2020) ("It is inherently the authority of the Bureau of Prisons to transfer an inmate to home confinement, pursuant to 18 U.S.C. § 3624(c)."). Therefore, this Court does not have the authority to place the defendant in home confinement. This request must be made through the BOP's administrative system. Further, to the extent that Whisonant asks the Court to stay his Motion until passage of the "Equals Act," I decline to do so. *See* ECF 329 at 3.

**D.**

As mentioned, Whisonant seeks to compel his defense attorney to produce defendant's case file, "so that he may pursue . . . appropriate relief as mandated by the constitution." ECF 301 at 1. On March 4, 2022, I ordered Burke to respond. ECF 302. Burke avers that Whisonant's initial attorney "entered into a nondisclosure agreement with the Government on May 1, 2017, that prohibits the release of discovery from the defense case file to" Whisonant. ECF 306 at 1. And, defense counsel indicates that he is "is not in possession of any documents, notes, or material responsive to the Petitioner's Motion to Compel that falls outside of the discovery protected by the non-disclosure agreement, except for personal information acquired from the Petitioner for the purpose of writing the Sentencing Memorandum in this case." *Id.*

The discovery agreement states: "All discovery is provided on the condition that ***counsel will not give copies of this material to the client*** or to anyone outside counsel's office, absent prior approval of the Government . . . ." ECF 306-1 at 2 (emphasis added). Whisonant has not argued that the discovery agreement is unlawful. Indeed, "[g]enerally, criminal defendants do not have a constitutional right to discovery, absent a statute, rule of criminal procedure, or some other entitlement." *United States v. Uzenski*, 434 F.3d 690, 709 (4th Cir. 2006); *see, e.g., United States v. Palacios*, 677 F.3d 234, 246 (4th Cir. 2012) ("Rule 16 imposes upon parties an ongoing duty to disclose 'additional evidence or material' discovered 'before or during trial ... if ... the other party previously requested, or the court ordered, its production.'") (quoting Fed.R.Crim.P. 16(c)).

It is not clear whether defense counsel has sought approval from the government to disclose Whisonant's case file. *See* Docket. But, "[u]pon termination of representation, an attorney shall take steps to the extent reasonably practicable to protect a client's interests, such as ... surrendering papers and property to which the client is entitled." Md. R. of Pro. Conduct 19-301.16(d); *see United States v. Basham*, 789 F.3d 358, 388 (4th Cir. 2015) (reviewing legal authority requiring counsel to deliver client's file upon termination of representation).

Notably, the government has not responded to Whisonant's Motion to Compel. *See id.* Accordingly, I shall direct the government to respond to Whisonant's Motion to Compel, indicating its position as to whether Burke may disclose defendant's case file pursuant to the discovery agreement. *See United States v. Powell,* 2021 WL 6116624, at *1 (4th Cir. Dec. 27, 2021) ("[T]he district court abused its discretion in denying [defendant's] motion to compel without considering the terms of the nondisclosure agreement and the impact, if any, on counsel's obligation under Rule 19-301.16(d).").

## V.  Conclusion

For the reasons set forth above, I shall grant the Motion, in part. Whisonant's total sentence shall be reduced from 360 months to 295 months of imprisonment, *i.e.*, 235 months for Count One and 60 months, consecutive, for Count Three. The terms and conditions of supervised release to which Whisonant was originally sentenced shall remain in place. I shall also order the government to respond to Whisonant's Motion to Compel, indicating to what extent, if any, it consents to Burke's disclosure of defendant's case file.

An Order follows, consistent with this Memorandum Opinion.

Date: June 26, 2023                              _____/s/_____
                                                 Ellen L. Hollander
                                                 United States District Judge